Harold **PRYOR** and Gregory E. Dennis, Petitioners–Appellants,

v.

Edward J. **BRENNAN**, Respondent–Appellee.

No. 89–3415.

United States Court of Appeals, Seventh Circuit.

Argued May 16, 1990.

Decided Sept. 27, 1990.

Keith A. Findley, Mary E. Green, Legal Assistance to Institutionalized Persons, Madison, Wis., for petitioners-appellants.

Patrick J. Fiedler, U.S. Atty., Cheryl B. Schacht, Asst. U.S. Atty., Madison, Wis., for respondent-appellee.

Before BAUER, Chief Judge, COFFEY, Circuit Judge, and SNEED, Senior Circuit Judge.*

SNEED, Senior Circuit Judge.

Harold Pryor and Gregory E. Dennis challenge the constitutionality of the District of Columbia Good Time Credits Act of 1986, D.C.Code Ann. §§ 24–428 to 24–434 (1989) (D.C.Act) on equal protection and due process grounds. They appeal the district court's dismissal of their petition for a writ of habeas corpus. We affirm.

## I.

### FACTS AND PROCEEDINGS BELOW

Pryor and Dennis each are serving sentences for violations of the District of Columbia Code.[1] Pursuant to D.C.Code Ann. § 24–425 (1989),[2] the U.S. Attorney General assigned Pryor to serve his sentence in a federal penitentiary. Pryor was transferred back into the District of Columbia (District) prison system in December 1989.[3] Whereas Dennis initially was assigned to, and served time in, a District facility, he

---

* Hon. Joseph T. Sneed, of the Ninth Circuit, sitting by designation.

1. On November 15, 1983, Pryor was sentenced to an aggregate term of fifteen to forty-five years in prison for violations of D.C.Code Ann. § 22–2902 (1989) (attempted robbery), §§ 22–2901 & 22–3202 (1989) (armed robbery), and § 23–1328 (1989) (committing an offense while on release pending trial).

On May 19, 1987, Dennis was sentenced to an aggregate term of five to fifteen years for violations of D.C.Code Ann. § 22–1801(b) (1989) (second degree burglary), § 33–549 (1988) (attempted distribution of heroin), and § 22–504 (1989) (assault).

2. Section 24–425 reads in pertinent part:

All prisoners convicted in the District of Columbia for any offense ... shall be committed, for their terms of imprisonment, and to such types of institutions as the court may direct, to the custody of the Attorney General

of the United States or his authorized representative, who shall designate the places of confinements where the sentences of all such persons shall be served. The Attorney General may designate any available, suitable, and appropriate institutions, whether maintained by the District of Columbia government, the federal government, or otherwise, or whether within or without the District of Columbia....

D.C.Code Ann. § 24–425 (1989).

3. Section 24–425 also provides for the *transfer* of District prisoners to other facilities:

The Attorney General is also authorized to order the transfer of any such person from one institution to another if, in his judgment, it shall be for the well-being of the prisoner or relieve overcrowding or unhealthful conditions in the institution where such prisoner is confined, or for other reasons.

D.C.Code Ann. § 24–425 (1989).

ultimately was transferred to a federal prison.

While housed in the District facility, both Pryor and Dennis accumulated good time credits pursuant to the D.C.Act. During their time spent in federal prison, however, appellants accumulated good time credits under the applicable federal statute and regulations. *See* 18 U.S.C. §§ 4105, 4161–4162 (1988), 28 C.F.R. §§ 523.12–523.16 (1989). Thus, for both individuals, the *situs* of imprisonment has determined how good time credits are calculated while at each location. The issue before us arises because the D.C.Act is substantially more generous to inmates than are the applicable federal provisions, particularly in the calculation of parole eligibility dates.

The D.C.Act limits its applicability to those persons "convicted of a violation of a District of Columbia ("District") criminal law by a court in the District of Columbia, *imprisoned in a District correctional facility....*" D.C.Code Ann. § 24–428(a) (1989) (emphasis added). Appellants assert that, as violators of the District of Columbia Code housed in federal prison, they differ from violators of this Code housed in District facilities *only* in the situs of their imprisonment. Situs of imprisonment, they insist, is not a rational basis upon which to distinguish among inmates' eligibility for good time credits under the D.C.Act. Therefore, they argue, the D.C.Act impermissibly discriminates between similarly situated persons in violation of the Fifth Amendment's equal protection guarantees.

Appellants underscore the alleged irrationality of the D.C.Act by pointing to another classification created by the District government. To relieve the overcrowding of its prisons, the District sents some of its offenders to the facilities of various states. These offenders, in contrast to District offenders in federal prisons, are treated *as though they were in District facilities* for the purpose of calculation of good time credits. Appellants contend that the distinction between District offenders in federal prisons and District offenders housed in state facilities for the purpose of calculating good time credits is irrational. Fi-

nally, Dennis claims that his due process rights were violated when, upon his transfer to a federal facility, he lost the right to continue earning District good time credits.

We have jurisdiction to review the district court's dismissal of the writ of habeas corpus under 28 U.S.C. § 2253 (1988).

## II.

### THE EQUAL PROTECTION CLAIM

A. *The Distinction Between District Offenders Housed in Federal Prisons and District Offenders Housed in District Prisons*

 In analyzing an equal protection claim, we determine first whether the claim involves a suspect class or a fundamental right. *See Plyler v. Doe,* 457 U.S. 202, 216–17, 102 S.Ct. 2382, 2394–95, 72 L.Ed.2d 786 (1982). This case does not present such a claim. *See Moss v. Clark,* 886 F.2d 686, 689–90 (4th Cir.1989); *Jackson v. Thornburgh,* 702 F.Supp. 9, 11 (D.D.C. 1988). Prisoners do not constitute a suspect class. *See French v. Heyne,* 547 F.2d 994, 997–99 (7th Cir.1976). *See also Moss,* 886 F.2d at 690; *Thornton v. Hunt,* 852 F.2d 526, 527 (11th Cir.1988) (per curiam). And, there is no fundamental right "of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 7, 99 S.Ct. 2100, 2104, 60 L.Ed.2d 668 (1979). *See also Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974); *Moss,* 886 F.2d at 690. Therefore, we apply the rational basis test—we presume legislation to be valid and sustain it "if the classification drawn by the statute is rationally related to a legitimate state interest." *Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). *See also Plyler,* 457 U.S. at 216, 102 S.Ct. at 2394; *McGinnis,* 410 U.S. at 270, 93 S.Ct. at 1059. This deferential standard of review is particularly appropriate when evaluating "the State's sensitive and difficult effort to encourage for its prisoners constructive future citizenship while avoiding the danger of releasing

them prematurely upon society." *McGinnis v. Royster*, 410 U.S. 263, 269–70, 93 S.Ct. 1055, 1059, 35 L.Ed.2d 282 (1973) (rational basis test appropriate when reviewing New York State good time credits statute).

The appellants concede that the primary interest to be served by the D.C. Act is the reduction of overcrowding in the District prisons and that this is a permissible objective. They do not challenge the rationality of a system of good time credits as a means of reducing the prison population. This system permits the early release of those who comport themselves well in prison and those who better prepare themselves for post-release life through prison academic and vocational programs. *See* D.C.Code Ann. §§ 24–428, 24–429. Thus, the question before us is whether the *distinction* created by the D.C. Act, between District offenders housed in District facilities and District offenders housed in federal facilities, is rational. We conclude that it is.

In an examination of one state's selective conferring of good time credit benefits on prison inmates, the Supreme Court upheld a statutory distinction between two groups of inmates. *See McGinnis*, 410 U.S. at 277, 93 S.Ct. at 1063. In *McGinnis*, the Court reviewed a New York State statute under which inmates who had served part of their sentence in pretrial confinement in a county or city jail did not accumulate good time credit for the "jail time" component of their total confinement. *Id.* at 264 & n. 1, 93 S.Ct. at 1056 & n. 1. By contrast, inmates who had been released on bail prior to sentencing and subsequently served their full period of incarceration in the state prison were eligible for good time credit for the entire period of confinement. *Id.* at 265, 93 S.Ct. at 1057. The inmates bringing suit contended that the statute set up an impermissible distinction between two groups of inmates because it "discriminates against those state prisoners unable to afford or otherwise qualify for bail prior to trial." *Id.* at 268, 93 S.Ct. at 1058.

Although the statute did distinguish between two groups of otherwise similarly-situated offenders on the basis of their ability to make bail, the Court upheld the statute. It held that the New York State legislature could reasonably have concluded that the rehabilitative purpose of the statute would be furthered by making the good time credits available in the state prisons, where rehabilitative programs exist, and by denying them to inmates in the county jails, where no such programs exist. *Id.* at 271–73, 93 S.Ct. at 1060–61. The latter facilities, admittedly, serve primarily as places of detention, rather than correctional, centers. The Court went on to note that it would be inappropriate to maintain a rehabilitative program in county jails for those who remained, at the time of their detention, "clothed with a presumption of innocence." *Id.* at 273, 93 S.Ct. at 1061.

Here, as in *McGinnis*, the good time credits law fashioned a system that properly met the particular needs of the jurisdiction conferring the benefits. Overcrowding in District of Columbia prisons had reached disturbing proportions.[4] The District needed to facilitate early release of prisoners to the maximum extent consistent with public safety. And to deal with its immediate overcrowding, the District made provisions for the movement of its offenders to federal and state prisons. At the same time, however, the District understandably remained concern about administrative efficiency.

■ Because District offenders are housed in juridically separate prison systems with different good time credits rules,

---

**4.** The overcrowding of the District prisons has been so acute in recent years that it has spawned much litigation. In one series of lawsuits, inmates at the various District correctional facilities alleged that the overcrowding violated their constitutional right against cruel and unusual punishment. For a discussion of these cases, see *United States v. District of Columbia*, 897 F.2d 1152, 1154 & n. 2 (D.D.C.1990). These lawsuits led the District to "close its prison doors" to adult male inmates sentenced by D.C. Superior Court until the inmate population decreased. *Id.* at 1154. Thereafter, the United States filed suit for declaratory and injunctive relief against the District, seeking under the authority of § 24–425 to force the District to reopen its doors. *Id.*

the District had to address the practical problem of which system's credits formula should control with respect to each period of residence. The solution required an attempt to maximize the achievement of multiple goals. The District sought to reduce overcrowding in its prisons while promoting good order in prison and the rehabilitation of its offenders. At the same time, it sought administrative efficiency and continued protection of the public through cautious application of the early release concept. No single formula for balancing these goals should be required under the Fifth Amendment. Certainly some adjustments of these multiple objectives might be constitutionally infirm. However, we should afford legislators considerable discretion in arriving at an adjustment that makes sense under the circumstances they confront.

In this case, the District Council could have logically concluded that it was appropriate to reserve the benefits of the D.C. Act *only* to those offenders housed in the seriously overcrowded D.C. correctional facilities.[5] Such a strategy might reasonably balance the goals of reducing overcrowding, protecting the public, and avoiding unmanageable administrative burdens.[6] *See McGinnis*, 410 U.S. at 270, 93 S.Ct. at 1059 (reviewing courts should not "inhibit state experimental classifications in [the] practical and troublesome area" of determining when early release of prisoners is

appropriate). "[A] legislature 'may take one step at a time, addressing itself to the phrase of the problem which seems most acute to the legislative mind.'" *Bowen v. Owens*, 476 U.S. 340, 347, 106 S.Ct. 1881, 1886, 90 L.Ed.2d 316 (1986) (quoting *Williamson v. Lee Optical Co.*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955)).[7]

We need not consider whether conferring eligibility for District good time credit benefits on those District offenders housed in federal prisons would, in our view, substantially *hinder* the D.C. Act's goals. The question before us "is not whether the District Council could have accomplished its legitimate purpose of reducing prison overcrowding without limiting good time benefits to" offenders housed in District facilities. *Moss*, 886 F.2d at 692. "The fact that some alternative means of attacking a problem [exists] is immaterial where the legislative judgment is a rational one, as is this one." *Id.* Even if appellants are correct in asserting that the D.C. Act might have been more effective if it was more inclusive, it is constitutional so long as the Act reflects *a* rational approach to the problem.

**B. *The Distinction Between District Offenders Housed in Federal Prisons and District Offenders Housed in State Prisons***

■ Appellants argue also that the granting of benefits under the D.C. Act to

---

**5.** In its analysis of the D.C. Act, the Fourth Circuit stated:

> As a practical matter, there may be a real difference between imprisonment in a federal prison and imprisonment in a District facility. The unprecedented overcrowding which plagues District prisons, most especially Lorton Reformatory, and which triggered [the D.C. Act] may in itself underscore that difference—a difference that supports the rationality of extending generous good time credits to D.C. inmates alone.

*Moss, 886 F.2d at 691.*

**6.** It would not be irrational for the District Council to conclude that applying its good time credits law to its offenders in federal prisons would pose administrative problems. Even the Federal Bureau of Prisons concluded that "requiring it to maintain two different good time schemes, one for District prisoners and one for all other prisoners, would create conflicts be-

tween inmates and would be administratively burdensome." *Moss*, 886 F.2d at 692.

**7.** The District Council, in enacting this legislation, could properly extend the D.C.Act's "benefits in such a manner as to address *only* the immediate problem at hand." *Jackson*, 702 F.Supp. at 12. Appellants argue, however, that "denying D.C. good time credits to D.C. offenders in federal prisons *conflicts* with the goal of alleviating D.C. overcrowding since the federal and D.C. systems are interrelated." (Emphasis added.) They may be correct in their observations that since the federal system does not have an unlimited capacity to absorb District offenders, some offenders transferred out of District prisons to federal facilities may be returned and again enhance District prison crowding. Even so, this possibility is an inadequate basis on which to find the Act irrational. To do so would merely substitute our view for that of the District.

District offenders *housed in state facilities* creates a second irrational classification. They contend that it is irrational to grant District offenders and state offenders the benefits of the D.C. Act while denying these benefits to District offenders in federal facilities. Furthermore, appellants claim that eligibility of District offenders in state facilities for the benefits of the D.C. Act is not legislatively mandated. They claim that this eligibility resulted from a discretionary decision by the District Department of Corrections and therefore deserves a higher level of scrutiny than we would accord a legislative judgment.

Contrary to appellants' assertions, the decision to apply the D.C. Act to District offenders housed in the prisons of other states was mandated by the D.C. statute that authorized the transfer of District inmates to the facilities of various states.[8] According to that statute, inmates sent to state facilities retain the same legal rights and benefits that they would have had if confined in a District facility. *See* Interstate Corrections Compact, art. IV., ¶¶ (e), (h) (codified at temporary D.C.Code Ann. § 24–1001, art. IV, ¶¶ (e), (h) (1989)). Thus, the District Council indirectly mandated, by statute, that District inmates housed in state facilities have the opportunity to earn good time credits according to the D.C. Act. We see no reason why the minimal scrutiny of the rational basis analysis should not apply to this distinction among offender groups as well.

The Interstate Corrections Compact, which sets forth the terms of any transfer of District inmates to state facilities, also mandates that the District retain jurisdiction over its inmates housed in state facilities, both during and after their incarceration. The Compact requires the "receiving" state institutions to send the District regular reports on the inmates, and the District, in turn, to follow inmates' progress during their sentences. *Id.*, art. IV., ¶¶ (c), (d), (f). The District retains authority to make all critical decisions affecting the inmates' status, including parole and release decisions. *Id.*, art. IV., ¶ (c). In addition, the inmates are returned to the District once their imprisonment is over for participation in parole, community programs, or other post-release programs. *Id.*, art. IV., ¶¶ (c), (g).

Given these requirements, it would be administratively burdensome for the District, while retaining decisionmaking authority in parole and release decisions for its inmates housed in other states, to apply the good time credit statutes of each of the different states in which its inmates were housed. This point is underscored by the fact that most District inmates transferred to the facilities of other states return to District facilities within a year, and all of these inmates are returned to the District system for parole.

The situation of District offenders sent to federal facilities is quite different from that of District offenders transferred to state facilities. The former are transferred administratively and permanently to the jurisdiction of the Federal Bureau of Prisons. Once transferred, the United States Parole Commission, not the District of Columbia Parole Board, exercises control over parole decisions involving District offenders in federal facilities. Although the District offenders may, in some cases, be transferred back to the District system, as was appellant Pryor, such transfers are not the general rule. Thus, we conclude that it was not irrational for the District Council to conclude that it would be administratively simpler to allow the correctional system with ultimate control and decisionmaking

---

**8.** The District Council passed the Authorization to Enter the Interstate Corrections Compact Emergency Act of 1988. *See* note following D.C.Code Ann. § 24–905 (1989). This Act is codified "temporarily" at D.C.Code Ann. §§ 24–1001 to 24–1002 (1989) and reads, in pertinent part: "The Mayor is authorized to enter into and execute on behalf of the District of Columbia a compact with any state or states legally joining in the compact in the form substantially as follows...." *Id.* Temporary § 24–1001 reprints the "Interstate Corrections Compact," which sets forth the terms of the agreement between the District and contracting states. *Id.* In addition, the Compact addresses, somewhat generally, the legal rights and benefits to which inmates sent to out-of-state facilities are entitled. *Id.*

authority concerning parole and release to apply its good time credits system.[9]

## III.

## THE DUE PROCESS CLAIM

■ Appellant Dennis, who was incarcerated in the District correctional system and then transferred to the federal system, argues that the District violated his due process rights by denying him the benefits of the D.C. Act without a hearing and a determination that he had committed disciplinary infractions. Dennis is incorrect when he claims that his "good time credits were revoked" upon transfer to the federal system. Even he concedes that he still retains the credits he earned while serving time in the District Department of Corrections. Thus, his real complaint is that he is unable to *continue* to accumulate credits according to the D.C. Act once he was transferred to a federal prison.

In *Wolff v. McDonnell,* 418 U.S. 539, 556–57, 94 S.Ct. 2963, 2974–75, 41 L.Ed.2d 935 (1974), the Supreme Court held that the Due Process Clause alone does not create a liberty interest in good time credits. But the Court held that once a state creates a right to good time credits, the Due Process Clause protects this right from being arbitrarily abrogated. *Id.* at 557, 94 S.Ct. at 2975. We do not decide here whether the language of the D.C. Act creates an interest in good time credits protected by the Fifth Amendment. We focus instead on the fact that Dennis was *never entitled* to earn good time credits under the D.C. Act for the period of incarceration spent in federal prison.

As already demonstrated, the D.C. Act, by its own terms, excludes from eligibility District offenders not housed in District facilities. The Interstate Corrections Compact authorizes that District offenders sent to state facilities are to be treated, for the purpose of legal rights and entitlements, *as if* they were confined in District facilities. No analogous legislation mandates such treatment for District offenders sent to the federal system. These latter offenders have no ground upon which to argue that they are entitled to the benefits of the Act. Thus, Dennis cannot properly argue that his transfer to the federal prison system led to the *revocation* or *denial* of an entitlement.[10] *See Moss,* 886 F.2d at 692. We hold, therefore, that there was no violation of liberty without due process.

AFFIRMED.

9. The appellants do not raise, and we do not consider, a challenge to D.C.Code § 24–425, which authorizes initial assignments and transfers of District offenders to the federal system. Nor do they challenge the practice of transferring to the federal system jurisdiction for these offenders' parole and release decisions. Therefore, they cannot successfully challenge here distinctions in the application of the District good time credit system that have resulted, for the most part, from the District's attempts to deal practically with the administrative burdens that arise from these transfer programs.

10. The way in which the District Department of Corrections and Federal Bureau of Prisons han-

dled the computation of good time credit of appellant was unfortunate. Initially, upon transfer to the federal system, Dennis was informed that his parole eligibility and mandatory release dates were those that had been computed when it had been anticipated that he would serve all of his confinement within the District system. Subsequently, correctional administrators rectified their computations, revising his expected parole eligibility date to take into account that he was serving part of his sentence in the federal system. The correction of the parole eligibility dates, however, does not constitute a "revocation" of good time credits earned requiring due process protection.