Joseph SCHULTZ, d/b/a Island Bar, and Tonya Norwood, Plaintiffs,

v.

THE CITY OF CUMBERLAND, Defendant.

No. 98–C–0107–C.

United States District Court, W.D. Wisconsin.

Nov. 5, 1998.

Randall D.B. Tigue, Minneapolis MN, for Plaintiffs.

Brady C. Williamson, Lafollette & Sinykin, Madison WI, for Defendant.

## OPINION AND ORDER

CRABB, District Judge.

In this civil action for declaratory and injunctive relief, plaintiffs challenge a municipal ordinance enacted by defendant City of Cumberland that establishes a comprehensive licensing and regulatory scheme for all "sexually oriented businesses." Among other things, the ordinance prohibits the depiction of "specified sexual activities" in a sexually oriented business and it bars anyone from appearing in a state of nudity in such a business. Also, the ordinance limits the hours that sexually oriented businesses may operate and prohibits anyone from operating or working in such a business without a valid license. Plaintiff Joseph Schultz is the sole proprietor of the Island Bar, an establishment located in the City of Cumberland that features live dancers, including plaintiff Tonya Norwood, who perform in a state of total nudity. Plaintiffs contend that numerous aspects of the ordinance violate their right to free speech or are unconstitutionally overbroad. Plaintiffs ask the court to declare the ordinance invalid and to enjoin defendant permanently from enforcing it. Defendant maintains that the ordinance is a content-neutral time, place and manner restriction designed to further defendant's substantial interest in reducing undesirable secondary effects associated with sexually oriented businesses.

The case is before this court on plaintiffs' motion for summary judgment and plaintiffs' motion to strike certain affidavits submitted by defendant. I conclude that by prohibiting the depiction of specified sexual activities and by prohibiting anyone from appearing in a state of nudity, the ordinance is unconstitutionally overbroad. These prohibitions could be applied just as easily to the Island Bar as they could to a commercial establishment featuring mainstream motion pictures or plays of unquestioned artistic merit in which there is a naked female breast or the depiction of two individuals engaging in sexual intercourse. Despite this potential, defendant has presented no evidence suggesting that prostitution, urban blight or other harmful secondary effects are associated with non-adult cinemas and theaters. I find

also that the disclosure requirements for individuals applying for a license to work in a sexually oriented business are unconstitutional. These requirements are not narrowly tailored to serve defendant's interest in insuring that employees of sexually oriented businesses refrain from engaging in criminal activity; the ordinance does not contain adequate measures to protect the confidentiality of personal information disclosed by applicants. Finally, provisions in the ordinance that make obtaining a license to operate a sexually oriented business contingent upon passing a building inspection and being current on all taxes are not justified by any evidence. In all other respects, the ordinance withstands scrutiny. However, because the unconstitutionally overbroad provision cannot be severed from the ordinance or rewritten by the court, the ordinance as a whole will be declared unenforceable. Plaintiffs are entitled to summary judgment. Plaintiffs' motion to strike will be denied.

On a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Oates v. Discovery Zone, 116 F.3d 1161, 1165 (7th Cir.1997). For the purpose of deciding this motion for summary judgment, I find from the parties' proposed findings of fact that there is no genuine dispute with respect to the following material facts.

## UNDISPUTED FACTS

Plaintiff Joseph Schultz is proprietor of the Island Bar, located in Cumberland, Wisconsin. Plaintiff Tonya Norwood is employed at the Island Bar as an exotic dancer. Defendant City of Cumberland is a municipal corporation organized under the laws of the state of Wisconsin.

In 1994, defendant enacted an ordinance regulating nude dancing in establishments that serve alcohol on their premises. Plaintiff Schultz challenged the ordinance unsuccessfully. On October 12, 1994, the city revoked the Island Bar's liquor license after determining that improper sexual activity had occurred on the premises. Presently, the Island Bar features the sale of non-alcoholic beverages and live nude entertainment.

In 1997, the mayor of Cumberland, Lawrence Samlaska, learned about communities that were enacting ordinances to regulate sexually oriented businesses. In May 1997, the mayor directed the city planning commission to consider zoning aspects of such ordinances and to establish a subcommittee to coordinate the process of accumulating, disseminating and analyzing data relevant for drafting such an ordinance. The subcommittee convened its first meeting on July 2, 1997; it met ten times between July 1997 and January 1998. The subcommittee delegated specific areas of research and inquiry to individual committee members.

From the outset, the subcommittee relied on a model ordinance created by the National Family Legal Foundation. According to its mission statement, the foundation is dedicated to providing legal assistance and educational resources to communities interested in combating negative secondary effects associated with sexually oriented businesses. Also, subcommittee members reviewed similar ordinances enacted by other communities in Wisconsin and Minnesota. Some of these ordinances dealt solely with zoning, others only with licensing and still others incorporated both zoning and licensing characteristics. Subcommittee member Carolyn Burns spoke with the city attorneys in these communities and, in some instances, with others familiar with the problems associated with sexually oriented businesses. Burns told the rest of the subcommittee what she had learned from these conversations and from her review of two books: Local Regulation of Adult Businesses, by Jules Gerard, a professor of law at Washington University; and Protecting Communities from Sexually Oriented Businesses, by Len Munsil, a lawyer.

Mayor Samlaska provided information to the planning commission and subcommittee. He told these bodies about undercover police surveillance that had taken place at the Island Bar and had resulted in arrests and convictions for prostitution, underage drinking, disorderly conduct and theft. Surveillance films depicted employees having inti-

mate physical contact and sexual relations with patrons.

Subcommittee member Jeffrey Streeter researched zoning and licensing issues. With respect to establishing an appropriate license fee, he considered estimated costs associated with processing an application and conducting background checks, ongoing records maintenance, estimated enforcement costs and license fees applicable to other types of businesses. For example, the fee for a liquor license is $500. Streeter and the subcommittee determined that a $100 application fee was necessary, in part, to cover investigation costs. On the basis of defendant's experiences with establishments licensed to sell liquor, the subcommittee determined that $400 was necessary to defray enforcement costs. The $25 fee for employee licenses was necessary to cover administration costs, records maintenance and issuing identification cards.

Subcommittee member Richard Nerbun researched health-related findings listed in the ordinance. He did so by culling statistics from publications issued by the Centers for Disease Control. For the most part, Nerbun focused on statistics related to sexually transmitted diseases. In addition, Nerbun researched the ordinance's hours of operation provision. He considered matters related to sexual assault and molestation of children and law enforcement response time on weekends. On several occasions, the subcommittee discussed police staffing concerns and how these concerns should play into the hours of operation provision. Specifically, subcommittee members recognized that there is only one police officer on duty Sunday through Thursday. During this period, citizens must rely on the county sheriff's office for law enforcement, which can result in a longer response time.

On December 10, 1997, the subcommittee sent a draft of the ordinance to the planning commission. Following a public hearing, all seven members of the planning commission voted unanimously to recommend adoption of the ordinance by the city council. On January 6, 1998, the city council conducted a public hearing. Following review and discussion, the city council voted unanimously, with all members present, to enact the ordinance. No other licensed businesses in the City of Cumberland are subject to the licensing, inspection, disclosure and disqualification requirements that apply to sexually oriented businesses.

Plaintiff Norwood and other dancers at the Island Bar perform in a state of nudity, as defined in the ordinance. She uses a stage name to prevent customers from learning her true name or her home address. Plaintiff Norwood is afraid that a customer would be able to obtain personal information about her from licensing records kept by defendant pursuant to the ordinance. In the event that the ordinance is enforced, Norwood will not apply for a license in order to continue working for the Island Bar. Instead, she will practice her profession as an exotic dancer elsewhere.

## OPINION

### I. THE ORDINANCE

Defendant's ordinance regulates so-called "sexually oriented businesses" and is divided into twenty-four sections, three of which are the subject of this lawsuit: 1) the prohibition against depicting "specified sexual acts" and appearing in a "state of nudity"; 2) the hours of operation provision; and 3) various licensing requirements imposed on owners and employees of sexually oriented businesses. Key to an understanding of these provisions and the constitutionality of the ordinance are two sections containing extensive findings and definitions of important terms.

The preamble and first section of the ordinance set forth several declarations and findings. Among the declarations provided are the following:

WHEREAS, sexually oriented businesses require special supervision from the public safety agencies of the City in order to protect and preserve the health, safety and welfare of the patrons of such businesses as well as the citizens of the City;

WHEREAS, the City Council finds that sexually oriented businesses are frequently used for unlawful sexual activities, including prostitution and sexual liaisons of a casual nature; and

WHEREAS, the concern over sexually transmitted diseases is a legitimate health

concern of the City which demands reasonable regulation of sexually oriented businesses in order to protect the health and well-being of the citizens; and

**WHEREAS,** licensing is a legitimate and reasonable means of accountability to ensure that operators of sexually oriented businesses comply with reasonable regulations and to ensure that operators do not knowingly allow their establishments to be used as places of illegal sexual activity or solicitation; and

\* \* \* \* \* \*

**WHEREAS,** the City Council has determined that location criteria alone do not adequately protect the health, safety, and general welfare of the people of this City;

\* \* \* \* \* \*

*City of Cumberland, Wis., Municipal Code,* § 12.15. In addition to these and other declarations, the ordinance contains a number of findings based on "evidence" in "studies" from several cities. Included among such findings are several statements regarding the connection between sexually oriented businesses and the spread of crime, urban blight and sexually transmitted diseases. For example, one finding contained in the ordinance declares:

It is desirable in the prevention of the spread of communicable diseases to obtain a limited amount of information regarding certain employees who may engaged in the conduct which this ordinance is designed to prevent or who are likely to be witnesses to such activity.

§ 1(B)(22).

Section 8(A) of the ordinance prohibits anyone in a sexually oriented business from appearing in a "state of nudity," defined as the showing of the human male or female genitals, pubic area, vulva, anus, anal cleft or cleavage with less than a fully opaque covering, the showing of the female breast with less than a fully opaque covering of any part of the nipple, or the showing of the covered male genitals in a discernibly turgid state.

§ 2(15). An employee of a sexually oriented business may appear in a state of semi-nudity, provided the employee is at least ten feet from patrons and perched on a stage elevated at least two feet off the floor.

§ 8(B). The ordinance contains the following definition of "semi-nude":

[T]he showing of the female breast below a horizontal line across the top of the areola at its highest point or the showing of the male or female buttocks. This definition shall include the entire lower portion of the human female breast, but shall not include any portion of the cleavage of the human female breast, exhibited by a dress, skirt, leotard, bathing suit, or other wearing apparel provided the areola is not exposed in whole or in part.

§ 2(19). In addition to prohibiting total nudity, section 8(A) also bars the depiction of "specified sexual acts," a term that encompasses "sex acts, normal or perverted, actual or simulated, including intercourse, oral copulation, masturbation, or sodomy." § 2(24).

Included among the definition of "sexual oriented businesses" are adult cabarets, theaters and motion picture theaters. § 2(21). "Adult cabaret" is defined as "nightclub, bar, restaurant, or similar commercial establishment which regularly features: (a) persons who appear in a state of nudity or semi-nude; or . . . (c) films, motion pictures, video cassettes, slides or other photographic reproductions which are characterized by the depiction or description of 'specified sexual activities' or 'specified anatomical areas.'" § 2(3). The ordinance does not define "regularly feature" but states that "specified anatomical areas" include "(a) the human male genitals in a discernibly turgid state, even if completely and opaquely covered; or (b) less than completely and opaquely covered human genitals, pubic region, buttocks or a female breast below a point immediately above the top of the areola." § 2(22).

Sexually oriented businesses may operate only within certain times set by the ordinance. They must remain closed on Sundays and may operate only between 10 a.m. to 12 midnight, Monday through Saturday. These restrictions apply to all sexually oriented businesses except for adult motels. § 10.

Under the ordinance, it is illegal to operate a sexually oriented business or work in such a business without a license from defendant. § 11. These licenses are issued subject to certain disclosure, inspection and disqualifi-

cation provisions. To obtain an operator's license, an applicant must provide his or her name, age, mailing and residential addresses, aliases, a recent photograph and must divulge whether he or she has been convicted of "specified criminal activity." § 11(E). An individual applying for an employee license must provide this same information as well as his or her date and place of birth, height, weight, hair and eye color, home and business telephone numbers and fingerprints. § 11(F) and (G). If the prospective operator of a sexually oriented business is a corporate entity, as opposed to an individual, each person with an ownership interest in the business greater than 20% must sign the license application and comply with the disclosure provisions set forth in subsection (E). § 11(D).

The ordinance establishes certain standards with which defendant must comply when investigating applications and issuing licenses. Upon receiving an employee license application, defendant must issue a temporary license to the applicant. § 12(A). Defendant must complete the licensing process within thirty days after receiving an application, whereupon defendant must issue a license unless review of the application reveals one or more of five enumerated "findings," including a determination that the applicant has been convicted of specified criminal activity. *Id.* With respect to applications for an operator's license, defendant must act within the same 30–day time frame and may deny a license if it finds, among other things, that the applicant owes overdue taxes, fees, fines or penalties, that the applicant has been convicted of specified criminal activity or that "the premises to be used for the sexually oriented business have not been approved by the health department, fire department, and the building official as being in compliance with applicable laws and ordinances." § 12(C). In addition, defendant not issue a license if the applicant has not paid his or her application fee, $25 for an employee license and $400 for an operator's license. § 14.

## II. INTRODUCTION

■ The constitutionality of many of the provisions from defendant's ordinance turns on whether these provisions are designed to combat secondary effects associated with nude dancing or whether they target the content of the message conveyed by such dancing. For example, a local government may not force adult movie theaters to be located in a particular area of the city because the government finds the content of films displayed by such theaters distasteful; this would be viewpoint discrimination, which is prohibited by the First Amendment. However, the same government could enact a similar regulation in order to control urban blight and related problems associated with adult theaters. *See Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). As already indicated, the constitutionally significant distinction between these approaches to regulating adult theaters is that the first ordinance is justified by reference to content while the second ordinance is justified by reference to "undesirable secondary effects of such businesses." *Id.* at 49, 106 S.Ct. 925. An analysis of defendant's ordinance must be guided by two Supreme Court opinions. *See Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991); *Renton,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29.

### A. *Barnes and Renton*

■ The First and Fourteenth Amendments prohibit governments from abridging "the freedom of speech." Although the term "speech," as used in the Constitution, encompasses nonverbal communication and expressive conduct, the Supreme Court has long since rejected the notion "that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *United States v. O'Brien,* 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). For example, public nudity by itself is not protected speech, *see Barnes,* 501 U.S. at 571, 111 S.Ct. 2456 (plurality) (little if any message conveyed by appearance of individuals at nude beach), *id.* at 573–574, 111 S.Ct. 2456 (Scalia, J., concurring) (same), *id.* at 581, 111 S.Ct. 2456 (Souter, J., concurring) (same), but non-obscene nude dancing does have some status under the First Amendment because it is expressive conduct that conveys an erotic message. *See Barnes,* at 565–566, 111 S.Ct. 2456 (plurality) (nude dancing is "ex-

pressive conduct within the outer perimeters of the First Amendment, though we view it as only marginally so"); *Schad v. Borough of Mt. Ephraim,* 452 U.S. 61, 65, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981) (an entertainment program may not be prohibited solely because it displays the nude human figure); *Jenkins v. Georgia,* 418 U.S. 153, 161, 94 S.Ct. 2750, 41 L.Ed.2d 642 (1974) (nudity alone does not place otherwise protected material outside mantle of First Amendment).

 Governments may ban or restrict nonverbal expressive activity "because of the action it entails, but not because of the ideas it expresses—so that burning a flag in violation of an ordinance against outdoor fires could be punishable, whereas burning a flag in violation of an ordinance against dishonoring the flag is not." *R.A.V. v. City of St. Paul,* 505 U.S. 377, 386, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (citations omitted). In other words, laws that regulate protected speech fall into one of two categories: content-based or content-neutral. A content-based law regulates speech or conduct on the basis of "hostility or favoritism towards the underlying message expressed." *Id.* at 386, 112 S.Ct. 2538.

At first glance, many laws that regulate expressive conduct do not fit neatly into either of these categories. *See Renton,* 475 U.S. at 47, 106 S.Ct. 925 (zoning restrictions for adult movie theaters). To distinguish between content-neutral and content-based laws, the Supreme Court has applied two different analytical frameworks, one of which is derived from *O'Brien,* 391 U.S. at 367, 88 S.Ct. 1673, the other from *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). Although these frameworks are not formulated alike, the Court has acknowledged that there is little, if any, substantive difference between them. *See Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 566, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (plurality) (*O'Brien* and *Clark* tests "embody much the same standards...."); *Clark,* 468 U.S. at 298, 104 S.Ct. 3065 (same). *See also International Eateries of America, Inc. v. Broward County,* 941 F.2d 1157, 1161 n. 2 (11th Cir.1991) (same substantive outcome under either standard).

*O'Brien* and *Clark* each involved laws that restricted or banned expressive activity. In *O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672, an individual protesting the Vietnam War was arrested for burning his draft card in violation of federal law. The Court held that the type of "symbolic speech" engaged in by the protester is entitled only to qualified protection under the First Amendment, concluding that "when 'speech' and nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *Id.* at 376, 88 S.Ct. 1673. In these situations, courts are directed to gauge the sufficiency of a governmental interest by inquiring whether: 1) the regulation is within the constitutional power of the government; 2) the regulation furthers an important or Substantial governmental interest; 3) the governmental interest is unrelated to the suppression of free expression; and 4) whether the incidental restriction on First Amendment freedoms is no greater than is essential to the furtherance of the governmental interest. *Id.* at 377, 88 S.Ct. 1673.

In *Clark,* 468 U.S. at 289, 104 S.Ct. 3065, the Court held that a National Park Service regulation prohibiting camping in certain parks did not violate the First Amendment when applied to prohibit demonstrators from sleeping in such parks as a part of their demonstration. After acknowledging that all manner of expression is subject to reasonable time, place and manner restrictions, the Court noted that such restrictions "are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Id.* at 293, 104 S.Ct. 3065 (citations omitted).

The Court has applied the *O'Brien* and *Clark* tests in two cases involving laws that regulate erotic speech. *See Barnes,* 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504; *Renton,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29. *Renton* stands for two propositions: 1)

time, place and manner restrictions enacted to combat secondary effects associated with some form of erotic speech are content-neutral; and 2) governments need not conduct independent studies in order to justify the existence of a causal link between the restricted activity and the secondary effects so long as they rely upon the experiences of other cities. *Renton* involved a zoning restriction prohibiting any adult movie theater from locating within 1,000 feet of a residential zone, family dwelling, church or park and within one mile of a school. The Court concluded that "the Renton ordinance is aimed not at the *content* of the films shown at [adult theaters], but rather at the *secondary effects* of such theaters on the surrounding community." *Renton*, 475 U.S. at 47, 106 S.Ct. 925. Secondary effects identified by the Renton city council included unspecified "harmful effects on the area and . . . neighborhood blight." *Id.* at 51, 106 S.Ct. 925. Addressing the first part of the *Clark* test, the Court labeled the ordinance "content-neutral" because Renton "*justified* [it] without reference to the content of the regulated speech." *Id.* at 48, 106 S.Ct. 925 (citations and quotation marks omitted). For this reason, Renton could draw a distinction between adult theaters and other theaters without running afoul of the First Amendment. In addition, the Court dismissed an objection regarding the evidence used by the Renton city council to justify the need for such an ordinance. Rather than compiling a study documenting the harmful secondary effects brought about by adult theaters located in Renton, the city council "relied heavily on the experience of, and studies produced by, the city of Seattle." *Id.* at 50, 106 S.Ct. 925. Despite this shortcut, the Court held that the "First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce new evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." *Id.* at 51–52, 106 S.Ct. 925.

 *Barnes* is the Court's latest exegesis on the subject of erotic speech. It presents a vexing interpretive problem. Although five justices voted to uphold Indiana's public indecency law requiring exotic dancers to wear G-strings and adhesive patches covering their nipples (known in the business as "pasties"), the case produced three divergent opinions, neither of which commanded a majority of the Court. Chief Justice Rehnquist announced the judgment of the Court, in which Justices O'Connor and Kennedy joined. Justices Souter and Scalia filed separate concurrences. When courts are confronted with such fractured Supreme Court opinions, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). Put another way, courts confronted with such opinions should attempt to find the common denominator upon which a majority of justices agree. *See Village of Bolingbrook v. Citizens Utilities Company of Illinois*, 864 F.2d 481, 483 (7th Cir.1988). However, where no such common denominator exists, courts are not required to create one. *See Schindler v. Clerk of Circuit Court*, 715 F.2d 341, 345 n. 5 (7th Cir.1983). Expanding on this concept, the Court of Appeals for the Third Circuit has emphasized that

> it is not always possible to discover a single standard that legitimately constitutes the narrowest ground for the decision. . . . "*Marks* is workable—one opinion can be meaningfully regarded as 'narrower' than another—only when one opinion is a logical subset of other, broader opinions. In essence, the narrowest opinion must represent a common denominator of the Court's reasoning; it must embody a position implicitly approved by at least five Justices who support the judgment."

*Rappa v. New Castle County*, 18 F.3d 1043, 1057 (3d Cir.1994) (quoting *King v. Palmer*, 950 F.2d 771, 781 (D.C.Cir.1991) (en banc)). In cases in which at least five justices do not agree implicitly on a single rationale, "no particular standard constitutes the law of the land, because no single approach can be said to have the support of a majority of the court." *Rappa*, 18 F.3d at 1058. In a case such as *Barnes* where "the majority votes to uphold a law as constitutional, the 'narrowest grounds' principle will identify as authoritative the standard articulated by a Justice or

Justices that would uphold the fewest laws as constitutional." *Planned Parenthood v. Casey,* 947 F.2d 682, 694 (3d Cir.1991), *aff'd in part, rev'd in part,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). This formulation of the standard suggests that the purpose behind *Marks* is two-fold: "to promote predictability in the law by ensuring lower court adherence to Supreme Court precedent," *id.* at 693, and, at the same time, to limit the precedential reach of cases in which a majority of justices do not join in a single opinion.

In *Barnes,* the plurality and Justice Souter agreed that the statute furthered a substantial interest but parted ways over what that interest was. The Court could not forge a consensus on this issue, in part, because the text of the statute contained no indication why the Indiana legislature enacted it. The Chief Justice surmised that the legislature did so to protect "order and morality" and concluded that this constituted a substantial governmental interest under the second step of the *O'Brien* test. *See Barnes,* 501 U.S. at 569, 111 S.Ct. 2456. Justice Souter identified a different governmental interest, the eradication of secondary effects associated with nude dancing, such as prostitution, sexual assault and other criminal activity. *See Barnes,* 501 U.S. at 582–583, 111 S.Ct. 2456 (citing *Renton,* 475 U.S. at 44, 106 S.Ct. 925).

The disagreement in *Barnes* between Justice Souter and the plurality has broad implications for the ability of governments to regulate erotic speech. For example, defendant has justified its ordinance, in part, to promote the "morals" of its citizenry. Governments interested in enacting regulations like the one promulgated by defendant would enjoy considerably more latitude to do so if such regulations could be justified by nothing more than a vague reference to "morals" and "order." Adoption of this proposition by the Court would virtually eliminate the requirement imposed in *Renton,* 475 U.S. at 51–52, 106 S.Ct. 925, that a city rely on some evidence—however tenuous—establishing a link between the form of expression and the governmental interest asserted. In contrast to Justice Souter, the opinion of the Chief Justice reveals no indication that such evidence would be necessary in order to sustain morality-based justifications. For these reasons,

most courts that have applied the *Marks* rule to *Barnes* have concluded that Justice Souter's opinion represents the controlling holding because it is "narrower" than the rationale to which the plurality subscribed. *See, e.g., J & B Entertainment, Inc. v. City of Jackson,* 152 F.3d 362 (5th Cir.1998); *Triplett Grille, Inc. v. City of Akron,* 40 F.3d 129 (6th Cir.1994); *International Eateries of America, Inc. v. Broward County,* 941 F.2d 1157 (11th Cir.1991); *Lounge Management v. Town of Trenton,* 219 Wis.2d 13, 580 N.W.2d 156, 160 (1998). To the extent that these cases stand for the proposition that the standard articulated by Justice Souter is narrower because it would uphold the fewest laws as constitutional, *see Planned Parenthood,* 947 F.2d at 694, I agree.

However, I believe that these cases fail to take into account that the fifth member of the Court who voted in favor of upholding the Indiana statute, Justice Scalia, arrived at this conclusion by a route entirely different from his colleagues. Justice Scalia concluded that the Indiana law should be upheld, "not because it survives some lower level of First Amendment scrutiny, but because, as a general law regulating conduct and not specifically directed at expression, it is not subject to First Amendment scrutiny at all." *Barnes,* 501 U.S. at 572, 111 S.Ct. 2456 (Scalia, J., concurring). Justice Scalia did not agree implicitly or explicitly that the First Amendment is implicated by a statute such as the one in this lawsuit that is targeted at nude dancing, as opposed to public nudity in general. Indeed, he reached the opposite conclusion, maintaining that expressive conduct is entitled to First Amendment protection only "[w]here the government prohibits conduct *precisely because of its communicative attributes....*" *Id.* at 577, 111 S.Ct. 2456. Examples of such laws, according to Justice Scalia, include statutes that ban flag burning, *see United States v. Eichman,* 496 U.S. 310, 110 S.Ct. 2404, 110 L.Ed.2d 287 (1990); defacing the flag, *see Spence v. Washington,* 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974); wearing a black arm band, *see Tinker v. Des Moines Independent Community School Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); participat-

ing in a silent sit-in, *see Brown v. Louisiana,* 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966); and flying a red flag, *see Stromberg v. California,* 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931). Laws that suppress expressive conduct "as an incidental side effect of forbidding the conduct for other reasons," *Barnes,* 501 U.S. at 577, 111 S.Ct. 2456 (Scalia, J., concurring), fall outside the category delineated by Justice Scalia and should be subject to a rational basis standard, not the type of intermediate level First Amendment scrutiny endorsed by the plurality and Justice Souter. *See id.* at 579–580, 111 S.Ct. 2456. "Moral opposition to nudity supplies a rational basis for its prohibition, and since the First Amendment has no application to this case no more than that is needed." *Id.* at 580, 111 S.Ct. 2456. From this discussion, it is evident that Justice Scalia would likely classify defendant's ordinance as a content-neutral law that suppresses expressive conduct for reasons other than the communicative attributes inherent in nude dancing. *Cf. Triplett Grille,* 40 F.3d at 133 ("Justice Scalia ... concluded that nude dancing is not inherently expressive activity entitled to First Amendment protection").

These observations notwithstanding, it is possible to say that all five justices in the *Barnes* majority agreed on one issue: the Indiana statute did not violate the Constitution. Though these justices disagreed what threshold standard governments must meet in order to justify the constitutionality of laws regulating public nudity, all believed that Indiana had surpassed this threshold; some would simply set the bar higher than others. It is difficult to say whether this is enough of a consensus to conclude, as other courts have, that Justice Souter's opinion represents the authoritative holding in *Barnes.* The answer depends upon the extent to which *Marks* permits a court to "associate Justices with propositions they expressly rejected." Mark Alan Thurmon, Note, *When The Court Divides: Reconsidering The Precedential Value Of Supreme Court Plurality Decisions,* 42 Duke Law Journal 419, 429–430 (1992).

Fortunately, these questions need not be resolved here. The Court's earlier holding in *Renton* is substantially consistent with Justice Souter's concurrence in *Barnes;* both

require evidence of secondary effects to justify content-neutral regulation. To the extent that there are any differences between the two, these differences do not affect any substantive issues in this case. Therefore, I refer to Justice Souter's concurrence in *Barnes* for the persuasive guidance it offers in interpreting *Renton,* not to anoint it as "authoritative" under the *Marks* rule.

### B. *Secondary Effects*

■ A time, place or manner restriction designed to combat the undesirable secondary effects associated with certain businesses is reviewed under the standards applicable to "content-neutral" laws. *See Renton,* 475 U.S. at 49, 106 S.Ct. 925. Such a restriction does not amount to illegal viewpoint discrimination if it is 1) justified without reference to the content of the regulated speech; 2) narrowly tailored to serve a substantial governmental interest; and 3) preserves ample alternative means of communication. *See Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); *Clark,* 468 U.S. at 293, 104 S.Ct. 3065. *See also TK's Video, Inc. v. Denton County,* 24 F.3d 705, 707 (5th Cir.1994) (citing *Renton,* 475 U.S. at 50, 106 S.Ct. 925); *International Eateries,* 941 F.2d at 1161–1162.

■ Plaintiffs argue unpersuasively that this analytical framework is inapplicable because the ordinance is not content-neutral. They maintain that a law such as this one that targets only sexually oriented businesses discriminates on its face against a particular viewpoint, namely, a sexual or erotic viewpoint. The Supreme Court has held otherwise. Like defendant's law, the zoning ordinance upheld in *Renton* applied only to adult theaters but not to theaters that featured non-pornographic fare. Nevertheless, the Court characterized Renton's ordinance as content-neutral. *See Renton,* 475 U.S. at 47–48, 106 S.Ct. 925. The operative consideration is whether a law is *justified* without reference to the content of regulated speech, not whether it focuses on some businesses but not on others. *See id.* at 48, 106 S.Ct. 925. Plaintiffs' evidence regarding the shadowy influence of a nefarious right-wing organization is irrelevant to this inquiry. The court can "not strike down an otherwise con-

stitutional statute on the basis of an alleged illicit legislative motive." *Id.* at 48, 106 S.Ct. 925 (quoting *O'Brien,* 391 U.S. at 383, 88 S.Ct. 1673). In other words, the court does not ask why defendant *actually* enacted its ordinance; it asks whether defendant has offered evidence that it *could have* enacted it for a content-neutral reason. *See J & B Entertainment,* 152 F.3d at 373 ("We do not ask whether the regulator subjectively believed or was motivated by other concerns, but whether an objective lawmaker could have so concluded, supported by an actual basis for the conclusion"). When answering this question, the court is guided primarily by the text of the law in question. The language of the defendant's ordinance reveals that it is justified by reference to certain harmful secondary effects associated with sexually oriented businesses, not by reference to the erotic content of the message expressed by such businesses. The secondary effects identified in the ordinance include the prevention of crime, urban blight and the spread of sexually transmitted diseases. These are substantial governmental interests. *See, e.g., Renton,* 475 U.S. at 50, 106 S.Ct. 925. Thus, the ordinance fits comfortably within the content-neutral category.

 The first two parts of the secondary effects test actually embrace three important precepts. First, to justify a regulation, a government need not conduct its own studies; it may rely upon the experiences of other cities, as well as studies conducted by them, "so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem" addressed by the regulation. *Renton,* 475 U.S. at 52, 106 S.Ct. 925. This evidence may be nothing more than a reference to "detailed findings" summarized in a legal opinion involving a similar regulation. *See id.* at 51, 106 S.Ct. 925. Second, to show that substantial governmental interests are served by a regulation, a government is not required to establish conclusively that the regulated activity actually causes the secondary effects, only that it reasonably believes that "the effects are correlated with the existence of such establishments." *Barnes,* 501 U.S. 560, 585, 111 S.Ct. 2456, 115 L.Ed.2d 504 (Souter, J., concurring). For example, the Supreme Court did not force the city of Renton to prove that urban blight

is affirmatively associated with adult theaters in Renton or that such blight would move with the theaters. Instead, the Court allowed some latitude for Renton to "experiment with solutions to admittedly serious problems." *Renton,* 475 U.S. at 52, 106 S.Ct. 925 (quoting *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 71, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (plurality)). Finally, a regulation is narrowly tailored "[s]o long as the means chosen are not substantially broader than necessary to achieve the government's interest." *Ward,* 491 U.S. at 800, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). Put another way, the means chosen are narrowly tailored if a less restrictive alternative would promote the governmental interest less effectively. *See id.* at 799, 109 S.Ct. 2746 (quoting *United States v. Albertini,* 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985)).

To summarize, a government satisfies the first two elements of the *Clark/Ward* test by showing that 1) it has evidence upon which to base a reasonable belief that there is a correlation between the activity regulated and the alleged secondary; effect of that activity and 2) it reasonably believes the regulation enacted ameliorates the correlated secondary effect and the regulation is not substantially broader than necessary to achieve that goal.

### III. MOTION TO STRIKE

 Many of defendant's proposed findings of fact are based on affidavits submitted by various individuals who served on the subcommittee formed by the city planning commission. This subcommittee drafted defendant's ordinance. Plaintiff maintains that these affidavits should be stricken from the record because they violate the rule in Wisconsin that "a court may not rely upon the testimony of members of a legislative body for the purpose of determining what that body intended when it enacted a particular piece of legislation." *See La Crosse County v. Gershman, Brickner & Bratton,* 982 F.2d 1171, 1174 (7th Cir.1993) (citing *Labor and Farm Party v. Elections Bd.,* 117 Wis.2d 351, 344 N.W.2d 177, 180 (1984)). In *La Crosse,* the court of appeals reviewed a decision by the district court allowing seven members of a county board to testify about their motiva-

tions for voting for a particular resolution. The court held that the district court acted within its discretion in admitting testimony that supplemented language in the resolution but did not impeach it. *Id.* at 1174. However, the district court should not have allowed board members to explain their motivations for voting in favor of the resolution. The jury could have interpreted this testimony as the board's collective intent behind the resolution just as easily it could have attributed these views to the individuals who expressed them. *Id.*

■■■ The Wisconsin rule relied upon by plaintiff is inapplicable in a case such as this one governed by federal law. Once again, *Barnes* and *Renton* provide guidance. As this court noted recently in a similar case:

[A]s "long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem," it is evidence enough. *Renton,* 475 U.S. at 52, 106 S.Ct. 925. Moreover, it appears from Justice Souter's opinion in *Barnes,* 501 U.S. at 582, 111 S.Ct. 2456, that this evidence can be developed prior to enactment of the regulation *or* adduced at trial (or, presumably, as in this case, on a motion for summary judgment). *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 582, 111 S.Ct. 2456, 115 L.Ed.2d 504 (Souter, J., concurring). Certainly nothing in the *Barnes* plurality opinion would prevent the town from adducing evidence of secondary effects post-enactment, since the plurality (unlike Justice Souter) would not require the town to produce any evidence at all. *See Barnes,* 501 U.S. at 568, 111 S.Ct. 2456 ("It is impossible to discern, other than from the text of the statute, what governmental interest the Indiana legislators had in mind when they enacted this statute").

*DiMa Corporation v. Town of Hallie,* No. 98–C–240–C at 11–12 (W.D.Wis.1998). This passage expands upon a principle established earlier in this opinion: governments enjoy broad latitude in developing the evidence necessary to justify a content-neutral time, place or manner restriction that targets expressive conduct. Thus, defendant may supplement the enumerated findings in its ordinance with evidence that provides a more detailed explanation of the basis of these findings. The supplemental evidence contained in the affidavits submitted by defendant do not contradict any of the ordinance's existing provisions and do not create new findings or justifications.

Plaintiffs' motion will be denied.

## IV. MOTION FOR SUMMARY JUDGMENT

### A. *Section 8(A)*

Section 8(A) of the ordinance prohibits employees of sexually oriented businesses from appearing in a state of total nudity and it prohibits the depiction of specified sexual activities in a sexually oriented business. Plaintiffs argue that this provision is unconstitutional for two reasons: 1) defendant enacted it for the purpose of restraining the content of protected speech; and 2) it is facially overbroad.

### 1. *Secondary effects*

■■■ Section 8(A) satisfies the minimal evidentiary burden established by the Supreme Court. As in *Renton,* defendant has justified this provision by reference to "findings" in certain judicial opinions and in studies conducted by several other governments, including something called the "Report of the Attorney General's Working Group On the Regulation of Sexually Oriented Businesses." *See* § 1(B). Collectively, this forms the basis of twenty-five specific findings articulated in the ordinance. *See* §§ 1(B)(1) – 1(B)(25). Defendant has supplemented these findings from the ordinance with evidence regarding the incidence of crime associated with the Island Bar. Contrary to plaintiffs' assertion, these findings need not be measured against the law enforcement problems associated with non-sexually oriented businesses in Cumberland. Nothing in *Renton* or any of the three opinions written by the *Barnes* majority would require defendant to engage in this type of rigorous, comparative analysis. As underwhelming as defendant's "evidence" may be, it passes muster because it is reasonably relevant to the problems identified by defendant. *See Renton,* 475 U.S. at 51–52, 106 S.Ct. 925. For example, two provisions from the ordinance assert that employees of sexually oriented businesses "engage

in higher incidence of certain types of illicit sexual behavior than employees of other establishments" and that "[p]ersons frequent ... sexually oriented businesses for the purpose of engaging in sex within the premises" of these businesses. §§ 1(B)(2) and 1(B)(5). These findings are relevant to defendant's interest in preventing criminal activity, such as prostitution, and the spread of sexually transmitted diseases.

Whether these interests are *furthered* by requiring dancers to wear G-strings and pasties is, at first blush, a dubious proposition. It is not inherently obvious how covering a dancer's nipples with adhesive patches would reduce criminal activity associated with adult cabarets. Nevertheless, Justice Souter saw some logic to this notion, *see Barnes*, 501 U.S. at 584–586, 111 S.Ct. 2456 (Souter, J., concurring), and I find the correlation sufficiently plausible to agree. One can assume reasonably that an establishment featuring completely naked women gyrating on a stage is less likely to draw clientele of both sexes than an establishment featuring more modestly clad dancers. Further, one can assume that there is greater potential for trouble in an establishment in which the entertainment is all female and all naked and in which the clientele is all male. With these concerns in mind, an objective lawmaker reviewing the evidence of secondary effects described above *could have* concluded that there is a correlation between adult businesses and the illicit activity cataloged in the ordinance and that a ban on total nudity in adult cabarets is likely to reduce such activity.

The restrictions imposed on erotic dancing by section 8(A) of the ordinance are narrowly tailored and they preserve ample alternative means for communication. The only alternative less restrictive than pasties and G-strings would be total nudity—not an effective option. Dancers at establishments such as the Island Bar may still engage in expressive conduct that conveys an erotic message provided they do so in a semi-nude state. *See* § 12.15(8)(b). To convey their message effectively, they must simply rely more on technique and less on simple exposure.

In conclusion, section 8(A) is a valid time, place and manner restriction because it is justified without reference to the content of the expressive conduct that it regulates, because it is narrowly tailored to further defendant's substantial interest in reducing secondary effects associated with adult cabarets and because the ordinance leaves ample alternative means for erotic expression.

2. *Overbreadth*

Plaintiffs argue that even if section 8(A) of the ordinance is constitutional as applied to plaintiffs, it is facially overbroad because it applies to conduct defendant cannot legitimately regulate. An overbroad law burdens protected as well as unprotected speech. In doing so, such a law chills the First Amendment rights of third parties by encouraging them to remain silent for fear of prosecution in the face of a law of uncertain scope. *See Broadrick v. Oklahoma*, 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *NAACP v. Button*, 371 U.S. 415, 432–33, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). For this reason, the overbreadth doctrine allows a person who has engaged in conduct not protected by the Constitution to challenge the constitutionality of a law that might be used against individuals who do engage in protected conduct, *see Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 503, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985), but such persons may do so only when the threat presented by a statute is real and substantial, and "then only as a last resort." *Broadrick*, 413 U.S. at 615, 93 S.Ct. 2908.

Under this framework, even if section 8(A) is constitutional as applied to the Island Bar, it is overbroad because it makes no exceptions for "live performances with serious artistic, social and political value." *Triplett Grille*, 40 F.3d at 136; *see also Lounge Management Ltd. v. Town of Trenton*, 219 Wis.2d 13, 580 N.W.2d 156 (1998); *Fond Du Lac County v. Mentzel*, 195 Wis.2d 313, 536 N.W.2d 160 (Ct.App.1995). These and other similar forms of unclothed entertainment are not correlated with the type of harmful secondary effects identified by defendant but could conceivably fall within the sweep of the ordinance.

Defendant contends that the ordinance is not susceptible to limitless application because a business does not qualify as an "adult

theater" or "adult cabaret" unless it "regularly features" nudity or semi-nudity. *See* § B(3) and (7). Similar qualifications apply to the definition of "adult motion picture theaters." *See* §§ 2(5) and (6) ("establishment ... where ... motion pictures ... are regularly shown which are characterized by the depiction ... of 'specified sexual activities' or 'specified anatomical areas' "). The operative terms from these provisions, "regularly feature" and "regularly shown," are not defined in the ordinance. This is a problem. With no limitation on the scope of interpretation, the ordinance could apply to many businesses not connected with the harmful secondary effects identified in the ordinance. High brow artistic productions such as *Equus* and Diaghilev's *L'apres midi d'un faun* all feature nude performers who expose a "specified anatomical area" of their bodies. Many popular motion pictures such as *Titanic* have scenes which, in the stilted parlance of the ordinance, feature "the showing of [a] female breast with less than a fully opaque covering of any part of the nipple...." § 2(15). Numerous other commercial films like *The Godfather* include depictions of "specified sexual activities," as defined in section 2(24) of the ordinance ("sex acts, normal or perverted, actual or simulated, including intercourse ..."). *Titanic* and *The Godfather* have run for many weeks, even months, in movie theaters across the country. Such a theater located in the City of Cumberland could easily be classified as a sexually oriented business and become subject to the licensing requirements of the ordinance. Worse yet, even a licensed theater would be prohibited from showing mainstream, non-pornographic fare in which naked female breasts are depicted. As a result, films of unquestioned artistic merit, from *Last Tango in Paris* to *Schindler's List,* would be prohibited under the ordinance.

Defendant's reliance on *Barnes* is misplaced for two reasons. First, the Court explicitly refused to examine the Indiana statute under the overbreadth doctrine. As observed by the Chief Justice, "The Indiana Supreme Court appeared to give the ... statute a limiting construction to save it from a facial overbreadth attack." *Barnes,* 501 U.S. at 564 n. 1, 111 S.Ct. 2456 (plurality). Specifically, the Indiana high court held that

the statute applied only to nude dancing that takes place outside the context "of some larger form of expression." *State v. Baysinger,* 272 Ind. 236, 397 N.E.2d 580, 587. Unlike the Indiana statute, defendant's ordinance has not been so "limited" by a Wisconsin court. Second, Justice Souter expressed some skepticism whether the statute could survive an overbreadth challenge if it barred "expressive nudity in classes of productions that could not readily be analogized to the adult films at issue in *Renton* [ ]." *Barnes,* 501 U.S. at 585 n. 2, 111 S.Ct. 2456 (Souter, J., concurring).

### B. *Hours of Operation*

Section 10 of the ordinance permits sexually oriented business to be open from 10:00 a.m. to midnight, Monday through Saturday; businesses must remain closed all day Sunday. Plaintiffs argue that this provision is unconstitutional because it does not satisfy the secondary effects test and because it violates the equal protection clause of the Fourteenth Amendment. There is no merit to either of these claims.

#### 1. *Secondary effects*

■ Defendant has satisfied its threshold burdens with respect to the hours of operation provision. It has pointed to studies and experiences from other towns that show a correlation between sexually oriented businesses and the secondary effects it seeks to regulate. This evidence consists of general findings from the ordinance regarding the effect of adult entertainment on surrounding neighborhoods, crime and public health. Defendant has supplemented these findings with affidavits from those responsible for drafting the ordinance, providing a more detailed explanation of the rationale and studies relied upon by defendant. Specifically, these affidavits reveal that defendant has only one police officer on duty Sunday through Thursday. From this evidence, a legislator could conclude that restricting the number of hours of operation of sexually oriented businesses would promote public safety by permitting local law enforcement to focus its limited resources on matters unrelated to the problems associated with such businesses, some of which are more likely to occur during the

hours between midnight and dawn. Other courts have upheld similar ordinances on the basis of similar reasoning and evidence. *See, e.g., Richland Bookmart, Inc. v. Nichols,* 137 F.3d 435 (6th Cir.1998); *Mitchell v. Commission on Adult Entertainment Establishments,* 10 F.3d 123 (3d Cir.1993); *Tee & Bee, Inc. v. City of West Allis,* 936 F.Supp. 1479 (E.D.Wis.1996).

I agree with plaintiffs that the evidence presented by defendant in support of this provision does not explain in an entirely satisfactory way why sexually oriented businesses may not open until 10 a.m. Monday through Saturday and must remain closed entirely on Sunday. For example, defendant maintains that it cannot adequately protect school children from the dangers posed by sexually oriented businesses if those businesses are open as children are making their way to school each morning. Although this reasoning would seem to apply with equal force to children returning home from school, the ordinance allows sexually oriented businesses to be open during the after-school period. The justifications offered by defendant regarding the Sunday closure requirement are also problematic. According to defendant, this restriction is necessary because there is only one police officer on duty on Sunday. For some reason, however, the ordinance permits sexually oriented businesses to remain open other days of the week when only one officer is working. This leaves defendant's second justification, that Sunday closure is necessary to protect the morals of the community. As explained already, the plurality in *Barnes* agreed that preservation of morality could serve as a legitimate governmental interest but Justice Souter explicitly rejected this notion.

These issues are serious but not fatal to section 10 of the ordinance. Had defendant justified the entire provision or the entire ordinance by reference solely to morality, this would be a problem of constitutional magnitude. Defendant has not done so, however. In light of the generous standard to which governments are held on these threshold issues, it is sufficient that the evidence and rationale presented by defendant supports the ordinance generally. The rigorous, searching inquiry suggested by plaintiffs is inconsistent with this standard. If the questions raised by plaintiffs belong anywhere in the secondary effects test, it is within a discussion of the remaining considerations: whether the provision is narrowly tailored and whether it preserves ample alternative means of communication.

■ The hours of operation provision satisfies these elements. Like other parts of the ordinance, the provision is narrowly tailored to affect only the category of businesses shown to produce the unwanted secondary effects. *See Renton,* 475 U.S. at 52, 106 S.Ct. 925. Although the problems identified by plaintiffs suggest that the provision is over-inclusive, I am loathe to question the methods chosen by defendant too vigorously. Doing so would exceed the Supreme Court's mandate that "a regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Ward,* 491 U.S. at 800, 109 S.Ct. 2746; *see also Renton,* 475 U.S. at 52, 106 S.Ct. 925 ("city must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems"). The relevant inquiry is whether the provision is "substantially broader than necessary," *Ward,* 491 U.S. at 800, 109 S.Ct. 2746, not whether the statute is need of fine-tuning. Arguably, defendant could achieve its objectives effectively by allowing sexually oriented businesses to open at 8 a.m. rather than 10 a.m. but this is the type of judicial second-guessing the Court sought to prevent in *Ward.* Finally, despite the restrictions imposed by section 10, sexually oriented businesses enjoy ample alternative means to communicate their sexually explicit messages. Plaintiff Schultz may operate the Island Bar fourteen hours a day, six days a week.

### 2. *Equal protection*

■ In analyzing an equal protection claim, the court must determine initially whether the claim involves a suspect class or a fundamental right. *See Pryor v. Brennan,* 914 F.2d 921, 923 (7th Cir.1990). Plaintiffs are not a members of a suspect class, *see City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), and nude dancing is not a fundamental right. In light of these findings, plaintiffs' equal protection claim must be evaluat-

ed pursuant to the "rational basis test." *See Pryor,* 914 F.2d at 923. Under this test, the ordinance is presumed valid and will be upheld if it is "rationally related" to a "legitimate state interest." *See id.* I have decided these issues previously in the context of the discussion of the secondary effects test. To summarize: defendant has a legitimate interest in reducing illicit activity associated with sexually oriented businesses; section 10 of the ordinance is rationally related to this interest because it forces these businesses to remain closed when this activity is most likely to happen and when law enforcement is least capable of responding to it.

### C. *Licensing Provisions*

Plaintiffs argue that several licensing requirements contained in the ordinance are unconstitutional prior restraints on their right to free speech. Plaintiffs concede that defendant may require owners and operators of sexually oriented businesses to comply with a licensing scheme but maintain that this one is invalid in many respects. Further, plaintiffs contend that there is no constitutionally permissible justification for requiring employees of sexually oriented businesses to obtain a license. Beyond this general challenge, plaintiffs object to the disclosure requirements applicable to employees.[1]

The constitutionality of these provisions turns on two separate inquires: whether adequate procedural safeguards are built into the ordinance to limit the discretion of those administering it and whether the provisions are valid content-neutral time, place and manner restrictions aimed at secondary effects associated with sexually oriented businesses. *See FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 223, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990). Before proceeding, one qualification must be made. Even though the Supreme Court has indicated that application of the secondary effects test is appropriate when evaluating a licensing scheme for sexually oriented businesses, *see id.,* it is doubtful whether the third part of this test fits logically into an analysis of a prior restraint. Specifically, it does not make sense to ask whether someone denied an application to

work as an exotic dancer still has ample alternative means to engage in this type of erotic expression under the licensing scheme. Without a license, such an individual has no alternatives. Perhaps in response to this problem, the Fifth Circuit has applied a hybrid of the secondary effects test that essentially lops off the third step. *See TK's Video,* 24 F.3d at 709–10 (citing *Buckley v. Valeo,* 424 U.S. 1, 64, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam)). This seems to be a suitable way to adapt the secondary effects test to the licensing provisions in defendant's ordinance.

█ In general, a law that requires an individual to obtain a license before engaging in some form of protected speech is a prior restraint. *See Stokes v. City of Madison,* 930 F.2d 1163, 1168 (7th Cir.1991). Because nude dancing is a form of speech protected under the First Amendment, the licensing requirements imposed by defendant's ordinance on operators and employees of sexually oriented businesses are a prior restraint. A facial challenge may be brought against this type of law if it "gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 759, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). There are two reasons why defendant's ordinance confers such authority on those administering the licensing scheme. First, under § 13(B) of the ordinance, licenses are subject to annual review. *See id.* at 760, 108 S.Ct. 2138 ("periodic licensing requirement is sufficiently threatening to invite judicial review"). Second, the licensing system implemented by defendant's ordinance is directed "narrowly and specifically" at conduct associated with expression: nude dancing. *See id.*

█ Prior restraints bear a heavy presumption against constitutionality because "a free society prefers to punish the few who abuse rights of speech *after* they break the law than throttle them and all others beforehand." *See Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 559, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). To avoid running

---

**1.** Defendant has agreed to amend sections 11(E)(10) and 11(F)(7) insofar as they require

employee and operator applicants to disclose their social security numbers.

afoul of the First Amendment, a prior restraint must not place unbridled discretion in the hands of a government official or agency, *see Lakewood*, 486 U.S. at 757, 108 S.Ct. 2138, and must place some limits on the time within which a government decisionmaker must issue or deny the license. *See Vance v. Universal Amusement Co.*, 445 U.S. 308, 316, 100 S.Ct. 1156, 63 L.Ed.2d 413 (1980).

The ordinance has these two procedural safeguards. First, officials in charge of administering the ordinance are constrained by reasonably detailed, content-neutral standards. The ordinance requires defendant to issue temporary licenses pending the outcome of an initial determination or an appeal and it provides for prompt judicial review. Second, the ordinance sets appropriate time limits within which defendant must review applications. It requires defendant to make the initial licensing decision within 30 days of the application. Fire, health and building certifications must be completed within 20 days of the application.

Before analyzing the validity of the licensing provisions under the secondary effects test, a preliminary matter must be addressed. In support of their contention that the ordinance's licensing provisions are unconstitutional, plaintiffs rely heavily on *Genusa v. Peoria*, 619 F.2d 1203 (7th Cir.1980), which involved a municipal ordinance that imposed similar licensing requirements on the owners and employees of adult bookstores. Peoria passed this ordinance to prevent adult bookstores and other sexually oriented businesses from concentrating in a single area of the city or locating in close proximity to places of worship, schools and residential neighborhoods. *See id.* at 1209. The Seventh Circuit characterized three of the licensing requirements in Peoria's ordinance as content-based prior restraints. One such requirement provided that an adult bookstore could not obtain a license unless it passed certain building and fire code inspections not imposed on other businesses. The city maintained that this provision helped retard urban blight. The court found no evidence to support this justification, observing that "there is nothing in the record to indicate that adult bookstores, as a class, contain more faulty light switches or other violations than regular bookstores, as

a class." *Id.* at 1214. In the absence of a proper evidentiary basis, Peoria could not "single[ ] out [adult bookstores] for special regulation" without violating the standards applicable to time, place and manner restrictions established by the Supreme Court in *O'Brien*, 391 U.S. at 377, 88 S.Ct. 1673, and *Young v. American Mini Theatres*, 427 U.S. at 79–80. The two other provisions of the Peoria ordinance struck down by the Seventh Circuit made obtaining an employer license contingent upon passing a criminal background check and made working for an adult store contingent upon obtaining a special employee permit. The court of appeals concluded that these provisions had nothing to do with the city's interest in scattering sexually oriented businesses. *See Genusa*, 619 F.2d at 1218–19 and 1221.

*Genusa* no longer carries much persuasive weight because it predates what are now the leading cases on the regulation of sexually oriented businesses, *Renton* and *Barnes*. As discussed at great length elsewhere in this opinion, the standards applied by the Supreme Court in *Renton* and *Barnes* are considerably more generous and deferential to governments than those that existed at the time the Seventh Circuit decided *Genusa*. However, defendant's ordinance is much more ambitious than the Peoria law, encompassing a broad array of sweeping goals that go beyond the lone governmental interest recognized by the Seventh Circuit in *Genusa*: preventing sexually oriented businesses from clustering in one location. *See TK's Video*, 24 F.3d at 710 (Denton County ordinance outlines more ambitious objective than ordinance in *Genusa* ). The court doubted that Peoria's ordinance could be interpreted to include the prevention of urban blight. *See Genusa*, 619 F.2d at 1214. *Renton* and *Barnes* do not mean that defendant enjoys a free ride. In particular, defendant still must produce some evidence to justify its regulations. *See J & B Entertainment*, 152 F.3d at 372 (Justice Souter's concurrence in *Barnes* did not eliminate government's evidentiary burden).

1. *Operator disclosure: corporate affiliation*

 Under section 11(D) of the ordinance, if a corporate entity or partnership

applies for a license to operate a sexually oriented business, every shareholder with an ownership interest of 20 percent or more must comply with all of the disclosure and disqualification provisions applicable to individual applicants. Plaintiff Schultz does not have standing to challenge this provision. *See J.F. Shea Co. v. City of Chicago,* 992 F.2d 745, 749 (7th Cir.1993) (to establish standing, plaintiff "must be able to allege an injury that affects his own legal rights," not those of third party). The undisputed facts reveal that plaintiff Schultz is the sole proprietor of the Island Bar. Thus, he has no stake in the outcome of a challenge to section 11(D). *See Sierra Club v. Morton,* 405 U.S. 727, 732, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

2. *Operator disclosure and disqualification: prior criminal history*

 Under section 11(E)(3), applicants for an operator license must indicate whether they or anyone with whom they reside have been convicted of "specified criminal activity," a term defined as:

> prostitution or promotion of prostitution; dissemination of obscenity; sale, distribution or display of harmful material to a minor; sexual performance by a child; possession or distribution of child pornography; public lewdness; indecent exposure; indecency with a child; engaging in organized criminal activity; sexual assault; molestation of a child; gambling; or distribution of a controlled substance; or any similar offenses to those described above under the criminal or penal code of other states or countries.

§ 2(23).(a). An applicant need not disclose a prior conviction for specified criminal activity if the conviction was a misdemeanor and it is over two years old. In the case of a felony conviction, disclosure is not required if the offense is over five years old. § 2(23)(b). Applicants who have been convicted of speci-

fied criminal activity cannot receive a license. § 13(A)(3). In *Genusa,* 619 F.2d at 1219, the Seventh Circuit struck down similar requirements. The court found no evidence supporting Peoria's contention that "one of the deleterious effects caused by adult uses is an increase in crime." *Id.* More important, the Seventh Circuit concluded that the leading Supreme Court case at the time regarding the regulation of sexually oriented businesses, *Young v. American Mini Theatres,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310, did not authorize such a requirement. *See Genusa,* 619 F.2d at 1219.

By contrast, defendant has submitted evidence that shows a correlation between sexually oriented businesses and criminal activity. Indeed, defendant has gone one step further by proving that crime is associated with plaintiffs' establishment. Given this evidence, a legislator could conclude that refusing to license a sexually oriented business run by an individual with a prior conviction for a sex-related crime would reduce the amount of illicit activity correlated with such businesses. This objective cannot be accomplished without the information necessary to conduct such a background check. Under the more forgiving standard applied by the Supreme Court in *Renton* and *Barnes,* courts have upheld provisions similar to those enacted by defendant, provided they are narrowly tailored to require disclosure only of those offenses that bear some relationship to the type of criminal activity associated with sexually oriented businesses. *See, e.g., TK's Video,* 24 F.3d at 710; *FW/PBS, Inc. v. City of Dallas,* 837 F.2d 1298, 1304–05 (5th Cir. 1988), *rev'd on other grounds,* 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603; *Tee & Bee, Inc.,* 936 F.Supp. at 1488–91; *Ellwest Stereo Theater, Inc. v. Boner,* 718 F.Supp. 1553, 1571 (M.D.Tenn.1989). With few exceptions, defendant's ordinance applies exclusively to sex-related crimes such as prostitution, solicitation, child pornography and sexual assault. Defendant has narrowed its ordinance even further by not requiring disclosure of older offenses and by drawing a distinction between misdemeanor and felony offenses.[2]

2. Section 11(E)(3) requires applicants to disclose not only their own criminal history, but the criminal history of persons with whom they reside. Similarly, an applicant may not receive a license if someone with whom the applicant lives has

been convicted of specified criminal activity. § 13(C)(5). There are other disclosure and disqualification provisions in the ordinance that pertain to third parties. Plaintiffs have not chal-

### 3. Operator disclosure and disqualification: past licenses

 The ordinance requires operator-applicants to disclose whether they have ever applied for or held a license under the ordinance or a similar law; if so, applicants must state whether past licenses have been denied, suspended or revoked. § 11(E)(4). Applicants must also disclose whether they currently hold a sexually oriented businesses license. § 11(E)(5). An applicant is disqualified from receiving a license if defendant has revoked or denied a sexually oriented business license previously held by the applicant within the past year or if the applicant has had a similar license revoked or denied by another government within the past year. § 13(C)(4). Like the provisions providing for disclosure of an applicant's criminal history, these requirements will further defendant's interest in insuring that sexually oriented businesses are not run by persons inclined to encourage illicit activity. A legislator could conclude that an individual with a checkered licensing record presents more of a risk to the governmental interests identified in the ordinance. These provisions are narrowly tailored to require disclosure only of licenses to operate sexually oriented businesses and limit disqualification only to those applicants who have had a license denied or revoked within the past year.

### 4. Operator disclosure: photographs and aliases

 Applicants for an operator's license must disclose any aliases and provide defendant with a passport-size photograph. § 11(E)(1)(a) and (9). Without photographs and aliases, defendant would not be able to conduct background checks necessary to the purpose of deterring crime associated with sexually oriented businesses.

### 5. Operator disqualification: building inspection

 Under the ordinance, defendant will not issue a sexually oriented business license until the premises to be used for the business have "been approved by the health department, fire department, and the building official as being in compliance with applicable

laws and ordinances." § 13(C)(6). Defendant must complete such inspections within twenty days after receiving an application. § 13(E). According to defendant, this provision "furthers substantial governmental interests in avoiding urban blight, preventing criminal activity and promoting the health and safety of its citizens." Def.'s Br., dkt. # 21, at 39. Undoubtedly, these are substantial governmental interests. However, defendant has presented no evidence and cited no opinion containing findings showing that sexually oriented businesses tend to present a greater fire hazard than other businesses or are not as sound structurally. In the absence of such evidence, defendant cannot single out sexually oriented businesses for special regulation. See Genusa, 619 F.2d at 1214. By doing so, defendant has created a content-based law that burdens plaintiffs' ability to engage in constitutionally protected speech. Like every other business in the City of Cumberland, the Island Bar must comply with applicable health, fire and building regulations. If defendant is truly concerned about code violations at sexually oriented business such as the one run by plaintiff Schultz, defendant is free to enforce these regulations at any time.

### 6. Employer disqualification: taxes

 Section 13(C)(2) of the ordinance disqualifies applicants who are "overdue in payment to the City of taxes, fees, fines or penalties assessed against or imposed upon him/her in relation to any business." This requirement is without any evidentiary foundation. Specifically, defendant has presented no findings showing that the owners of adult cabarets are more likely than other business owners not to pay their taxes and it has adduced no evidence establishing a correlation between tax delinquency and the undesirable secondary effects associated with sexually oriented businesses. Defendant points to a similar provision in an ordinance governing the issuance of liquor licenses but fails to explain how selling alcohol can be characterized as constitutionally protected speech.

### 7. Employee licensing

 Under section 11(A)(2) of the ordinance, sexually oriented businesses are pro-

---

lenged these provisions and it does not appear that they have standing to do so. Third party disclosure requirements were not a feature of the ordinances at issue in TK's Video, FW/PBS, Tee &

Bee or Ellwest. I have grave doubts whether such requirements would withstand scrutiny. Nevertheless, this issue is not before the court.

hibited from employing anyone who does not hold a valid employee license. This requirement is constitutional for the same reasons that defendant can require owners and operators to obtain a license. In other words, employee licensing will help insure that individuals with a demonstrated propensity to engage in the type of illicit activity associated with sexually oriented businesses work elsewhere. This purpose could not be accomplished by simply relying on laws that outlaw prostitution.

### 8. *Employee disclosure*

Section 11(F) of the ordinance requires an individual applying for a sexually oriented business employee license to disclose substantially the same information that operators must provide. Unlike operators, however, employees must disclose their home telephone numbers and submit a form displaying their fingerprints. § 11(F)(4) and (G)(1). Defendant has satisfied the threshold requirement of presenting some evidence demonstrating a correlation between disclosure of this information and defendant's interest in reducing crime associated with sexually oriented businesses. To effectively investigate the backgrounds of applicants and verify information submitted by applicants, defendant must rely on detailed personal information.

This conclusion notwithstanding, defendant has failed to show that the employee disclosure provisions are narrowly tailored to serve crime prevention. Plaintiff Norwood has submitted an affidavit indicating that she would not perform as an exotic dancer in Cumberland if forced to reveal her real name, home address and telephone number. Norwood fears that a stalker could use Wisconsin's public records law, *see* Wis.Stat. §§ 19.31—19.39, to obtain this information. Ordinarily, Norwood prefers to conceal her true identity by using a stage name, lest any customer get the wrong idea. In response, defendant asserts that disclosure under the state open records law is not automatic; custodians of public records must perform a balancing test, weighing the general policy in favor of public access against any risk of harm to someone such as Norwood. *See Morke v. Record Custodian,* 159 Wis.2d 722, 725, 465 N.W.2d 235, 236 (Ct.App.1990). Even if these protections are inadequate,

defendant asserts that plaintiff Norwood's concerns are of no relevance to whether the disclosure provisions are narrowly tailored. Defendant is wrong.

A regulation is narrowly tailored so long as the interest it seeks to promote would be achieved less effectively without the regulation. *See Ward,* 491 U.S. at 799, 109 S.Ct. 2746. This does not mean, as defendant suggests, that a regulation "may burden substantially more speech than is necessary to further the government's legitimate interest." *Id.* at 799, 109 S.Ct. 2746. Plaintiff Norwood has averred that the disclosure requirements in the ordinance will not merely burden her willingness to engage in protected speech but squelch it entirely. In the absence of adequate safeguards built into the ordinance that will insure the confidentiality of information disclosed by employee applicants, sections 11(F) and (G) are not narrowly tailored because they "target[ ] ... more than the exact source of the 'evil' [they] seeks to remedy." *Frisby v. Schultz,* 487 U.S. 474, 485, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988).

### 9. *License fees*

All applications for a license to operate a sexually oriented business must be accompanied by a $100 non-refundable fee. § 14(A). In the event that defendant issues such a license, an applicant must pay an additional $400 licensing fee. § 14(B). Individuals applying for a sexually oriented business employee license must pay a $25 non-refundable licensing fee. § 14(C). Licenses must be renewed after one year.

It is well-established that the government may not levy a tax on the exercise of First Amendment rights. *See Murdock v. Pennsylvania,* 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943). However, the government may impose a fee that is incidental to a valid licensing scheme. The fee must be a "nominal fee imposed as a regulatory measure to defray the expenses of policing the activities in question." *Id.* at 113–14, 63 S.Ct. 870. If a government seeks to impose a fee for the operation of a business protected by the First Amendment, it has the burden of demonstrating that the fees are reasonably related to costs of administering the licensing system. *See South–Suburban Housing Center v. Greater Suburban Board of Realtors,* 935 F.2d 868, 898 (7th Cir.1991).

Defendant has met this burden. In establishing licensing fees imposed by the ordinance, defendant considered costs associated with processing and investigating an application, ongoing records maintenance, licensing fees imposed on other establishments, such as liquor stores, and the estimated cost of enforcing the ordinance. Plaintiffs have offered no evidence that casts doubt on the accuracy of these estimates.

### D. *Severability*

The prohibition against depicting specified sexual acts and appearing in a state of nudity is facially overbroad. In addition, three other aspects of the ordinance's licensing scheme are unconstitutional. The invalidity of these provisions raises the question whether the rest of the ordinance can he salvaged. An unconstitutionally overbroad statute should be invalidated only "to the extent that it reaches too far, but otherwise left intact." *Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 504, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985). A statute may be amenable to a limiting construction if it contains a severability clause. *See id.* at 506, 105 S.Ct. 2794. However, partial invalidation may not be possible if the legislature would not have adopted the statute without the unconstitutional element. *See id.* Section 22 of the ordinance has this to say about severability:

> In the event any section, subsection, clause, phrase or portion of this ordinance is for any reason held illegal invalid or unconstitutional by any court of competent jurisdiction, such portion shall be deemed a separate, distinct and independent provision, and such holding shall not affect the validity of the remainder of this ordinance. It is the legislative intent of the Common Council that this ordinance would have been adopted if such illegal provision had not been included or any illegal application had not been made.

Even in the face of a strong severability clause such as this one, courts are not authorized to "completely reconstruct a local ordinance ... [when] nothing short of rewriting could save [it]." *See American Booksellers Ass'n, Inc. v. Hudnut,* 771 F.2d 323, 332 (7th Cir.1985). Severance is improper if the unconstitutional provisions in defendant's ordinance are an integral part of the ordinance.

*See Ragsdale v. Turnock,* 841 F.2d 1358, 1375 (7th Cir.1988).

In *Ragsdale,* the Seventh Circuit invalidated portions of a statutory scheme regulating the ability of physicians to perform abortions in privately-run clinics. The statute contained provisions forcing clinics to counsel and test patients as well as a comprehensive licensing system that imposed a variety of staffing and physical plant requirements which, if implemented, would have made clinics "the functional equivalent of small hospitals." *Id.* at 1374. The court found that these aspects of the statute violated the right to privacy as established by the Supreme Court in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Addressing the issue of severability, the Seventh Circuit concluded that the statute did not represent a coherent regulatory scheme without the unconstitutional provisions—a troubling observation in light of the stiff penalties faced by physicians who violated the law. *See Ragsdale,* 841 F.2d at 1375. No useful purpose would be served by rewriting minor provisions of the law in an attempt to make the entire statutory framework constitutional. *See id.*

The unconstitutional provisions in defendant's ordinance cannot be severed from the ordinance as a whole. Doing so would produce an unclear statutory scheme that most likely would represent a greater problem than an unabridged version of the ordinance. Without a workable definition of "sexually oriented business," defendant has no way of identifying those establishments that it may legitimately regulate and license. In essence, what the ordinance needs is not redaction but revision.

### ORDER

IT IS ORDERED that:

1. The motion of plaintiffs Joseph Schultz and Tonya Norwood to strike certain affidavits submitted by defendant City of Cumberland is DENIED;

2. The motion of plaintiffs for summary judgment is GRANTED;

3. Section 8(A) of City of Cumberland Ordinance Section 12.15 is unconstitutionally overbroad.

4. Sections 11(F) and (G), 13(C)(6) and 13(C)(2) of the ordinance violate the First Amendment of the United States Constitution.

5. Defendant City of Cumberland is enjoined permanently from enforcing the ordinance as it is presently drafted.

6. The clerk of the court is directed to enter judgment for plaintiffs and close this case.